PURINTON *v.* PURINTON.

4-3757

Opinion delivered March 4, 1935.

*C. C. Wait,* for appellant.

*Robert Bailey,* for appellee.

BAKER, J. This appeal comes from a decree of the chancery court of Pope County, in a suit wherein Hettie Mae Purinton sued George D. Purinton, administrator of her deceased husband's estate. Thomas Ray Purinton, deceased, a soldier in the World War, carried War Risk insurance in the sum of $10,000. This was payable to certain named beneficiaries and provided for the payment of $57.50 per month to the insured upon total and permanent disability. While the policy was in full force and effect, on the 30th day of July, 1931, the said Thomas Ray Purinton died, which was some time after he had made claim for amounts due him on account of the total and permanent disability suffered. At the time of his death he left surviving him his widow, Hettie Mae Purinton, the appellant herein, and his little daughter, Bessie Marie Purinton, who later died.

About four days after the death of Thomas Ray Purinton, his brother, the appellee herein, George D. Purinton, without advising Hettie Mae Purinton of her right to be appointed administratrix, procured himself to be so appointed, promising to collect the estate and turn it over to her. On August 3, 1931, he procured his letters of administration, and also procured the correspondence that his deceased brother had or received concerning the allowance of his claim filed with the Veterans' Bureau. He pressed the said claim, furnishing such proof as necessary and finally made a total collection of $8,498.49. This collection was made, however, after the death of Thomas Ray Purinton's child, Bessie Marie Purinton, who died on November 27, 1932.

On the 13th of March, 1933, the administrator procured a contract to be prepared, which contract was dictated in appellant's presence by the attorney for the administrator, and which contract purported to be a final settlement, by which it was agreed that claims amount-

ing to $527.32 should be deducted from the total amount collected, though the claims had not been filed until more than a year after the appointment of the administrator, and that the remainder of the fund, $7,003.47, should be equally divided between the plaintiff and the administrator. It also provided that, should there be anything remaining or saved in the payment of claims, this should become the property of the appellee.

On the same day that this contract was signed, the money in the hands of the administrator was divided under the terms of the contract.

About four days thereafter the appellant here filed her suit in the chancery court of Pope County, alleging that her execution of the contract had been procured by fraud, deceit, undue influence, and that the contract should be set aside, and she should be given the full amount of the insurance collected.

The answer denied and put in issue all material facts of the complaint and pleaded the settlement as being effectual to preclude her from the right of recovery.

As to the legal rights of the appellant to the estate of her husband, herein set out, there is no dispute. She and her child were entitled to her husband's estate, less expense of administration and such debts as should properly be paid by said estate.

There is a great deal of testimony taken by the parties to defeat the alleged settlement and support it. It can be of no real service to the bench or bar, or even to the curious, to set forth this testimony with any minutiae of detail.

We think that the learned chancellor was in error in the decision and decree rendered. The determinative factors in this litigation are as follows: The appellee was the administrator of the estate. He had charge of the property belonging to the estate, and on account thereof there was a trust relation wherein he was bound to account faithfully for all of this property and to pay it over to those rightfully entitled to receive it.

When the administrator made his application for letters of administration, he named as parties interested in the estate only the appellant herein and her child, his

niece. He had an attorney learned in the law and who advised him clearly that these two parties, the appellant and her child, were the only parties interested, and after the death of the child that the mother would take all of this personal property. It must go without argument, as a recognized principle, that the rights of these parties were fixed as of the date and time of death of Thomas Ray Purinton. Their rights were vested. The appellant did not know until the time of settlement, or perhaps a day or two prior thereto, that her brother-in-law, the administrator, was making any claim to the estate, and the administrator says that prior to that time he had not thought about or made any claim thereto, though he had been somewhat interested to know whether or not his mother, brothers and sisters were not entitled to a share therein. Quoting from his statement, we find the following: ''I was not interested in the division of the estate until the day I was called down here for a settlement, and that settlement was made. I had not thought anything about a division of the estate. At that time I began to wonder and inquire, just in a friendly way, as to who would be entitled to receive the money.''

The administrator, however, was, at the time of the signing of the contract, unwilling to pay the money over to the appellant. She was extremely anxious to get the money into her possession because at the particular time banks were operating upon a restricted basis, and she did not want the money left in the banks. At that time the appellee asserted his claim to the money, and said that he had been advised that the appellant was entitled to one-third of the money and he and his mother and brothers and sisters to two-thirds, though advised then, by the attorney for the estate, that the appellant was entitled to all of the money.

While the appellant was hesitating about signing the contract or agreement, though she had been advised about her rights, the appellee said to her that he did not think she was entitled to all of it, as stated by the attorney, and advised her to get a lawyer and contest the matter, and also told her in event she did that, by the time she paid her lawyer's fee and other expenses, she probably

would not get as much as she was getting under the agreement proposed, and by this refusal to pay over to her and the threat that she would have a very expensive lawsuit, she finally said: "It would have to be satisfactory." At that particular time the attorney representing the administrator, as such, said that, if they did not agree, he would not represent either in event of litigation between them. The county and probate judge was present part of the time, and he acquiesced in the statement that litigation would be extremely expensive. Finally under this kind of pressure, and upon these representations and others, she signed the settlement and at once two checks were produced which she was required to indorse and one was given to her and one to the appellee.

A rather peculiar circumstance followed this act which is so highly corroborative of appellant's position at the time that it cannot be ignored. The appellant was advised that she must not carry this money about with her; that she should deposit it in a postal savings account, and this was good advice. Her brother-in-law, the appellee here, was with her helping her procure the money, went with her to the post office where she was able to deposit only $2,500, which was the full amount the post office would receive from any one individual. She delivered several hundred dollars of the remaining money to the brother-in-law, and permitted him to deposit it in the post office in his name. The record reflects that he gave to her the certificate showing the deposit, but she could not withdraw this fund deposited in the name of the appellee without his consent. Her act, however, is indicative of that supreme trust and reliance she must have had in him at the time. At the same time she withdrew from the bank one-half the proceeds, less the claims, the appellee withdrew about $1,800 and just a few days later he issued another check attempting to withdraw the remainder of the money left in the bank at the time he made the first withdrawal of $1,800, but was prevented by reason of the fact this suit had been filed.

The foregoing facts are, without dispute, in the record. From them we are forced to the conclusion that the claim made by the appellee to any part of the funds for

himself, or other members of his family, his mother, brothers, or sisters, was not made with any degree of good faith. It was made against the advice of counsel, whom he had selected as attorney for the estate and to whom he had paid fees. It was made deliberately at a time when the appellant needed money and when she was suffering distress and fear of the loss of the money by reason of banking restrictions which she did not and could not understand. It was committed under the threat of expensive litigation. The following testimony shows the actual conditions. The attorney for administrator asked the appellee the following questions:

"Q. Did you hear me advise her if she got in a lawsuit that the lawyers would get it all? A. Yes. Q. Did I advise her that if you did get in a lawsuit she would probably not get as much money and it would be the best thing to settle? A. Yes."

It would seem, from the record, that unless she accepted what was offered her at the time she could get none of the money, and would have to support and maintain this threatened litigation. During the negotiations leading to the settlement, this and similar statements seemed to have been repeated, or the effect thereof stated on different occasions before the actual signing of the contract.

Another peculiar thing is that the appellee, though he was insisting that this money he was withholding, in addition to the amount of claims, was for his mother, brothers and sisters, but at the time his testimony was taken he had not paid or sent to his mother or his brothers and sisters any part of it, and he refused to say or reveal what he had done with that part he had withdrawn from the bank, nor did he explain why he was attempting to withdraw the remainder from the bank immediately after the settlement.

The above facts with reference to the retention of one-half of this money before he would deliver to the appellant any part of the estate are aggravated by another circumstance. On the same day that the alleged settlement or agreement was entered into, a settlement was filed in the probate court and the administrator filed

with that settlement a voucher, or at least took a receipt from Hettie Mae Purinton, the appellant herein, for $7,003.47, though he gave her but one-half that sum. This could have been done for no other purpose than to show upon the face of the record that the party properly entitled to the entire sum had received it all, when in fact she had received but one-half of it. It is unnecessary to give copious citations of authorities showing the law, to the effect that the appellant is entitled to all of this money unless precluded by the contract. Section 3471, Crawford & Moses' Digest *et seq.* The property vested before this section was amended. *Jones* v. *Jones,* 186 Ark. 359, 53 S. W. (2d) 586.

But it is urged that the contract was a family settlement, and that on that account, to prevent litigation and save the estate, family settlements will be encouraged and upheld when possible to do so. We disagree, however, with the contention that this was a family settlement.

Thomas Ray Purinton had left the family circle in which he was born, and this controversy did not arise out of any property belonging to that family. He had married and had one child born of his marriage, and his was another family, and in that family of Thomas Ray Purinton there was no controversy to be settled. In that new unit of domesticity, the appellee, his mother, brothers and sisters were total strangers in law. The property in controversy grew out of services and sacrifices made by the soldier, and the beneficent returns of the National Government as compensatory of that service causing the broken condition and impairment of his health.

We recognize the principles that the law encourages settlements of controversies. Under conditions where there is no trust or confidential relations as between the parties, wherein they may deal with each other at arms' length and on equal footings, and there is no fraud or mistake, there is little difficulty in deciding issues in regard to such settlements, but this is not that kind of suit. The appellee in this case was the administrator of the estate. The fund in his hand was a trust fund, and he was held to somewhat rigid rules in the disbursement

of it. In addition he was the brother-in-law, trusted by the appellant, who seemed to believe that he was attempting to deal with her honestly and upon fair principles. The controversy between them must be governed by the case of *Outlaw* v. *Finney,* 175 Ark. 502, 1 S. W. (2d) 38. The facts in the two cases are somewhat similar. The principles of law announced in the cited case must be applied in this case.

The decree in this case is therefore reversed, the cause is remanded with directions to enter a decree canceling the settlement, and, since the probate court has held that claims filed against the estate are barred by the statute of limitations, or by nonclaim, the appellant is to be permitted to recover the full amount of insurance, less actual expenses incurred in the administration, which will include. the $250 already paid to the attorney, as sufficient compensation in the management of the estate, but without commission to the administrator, on account of his wrongful assertion of claims and consequent litigation arising therefrom, and the appellee will pay all costs, and for such other action in the event there has been any valid claim proved within the proper time against the said estate, not inconsistent with the views we have herein expressed.